UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| NITKA, INC.<br><br>         Plaintiff,<br><br>  -against-<br><br>ZILLOW, INC.<br><br>         Defendant. | Case No.: 1:24-cv-5688<br><br>**COMPLAINT** |

**PRELIMINARY STATEMENT**

1. Plaintiff Nitka, Inc. ("Nitka") files this action against Defendant Zillow, Inc. ("Zillow") (collectively, the "Parties"), seeking redress for misrepresentations and predatory actions that have caused significant financial harm to Nitka. In late 2022, Zillow approached Nitka to identify, interview, and recommend specialized technical support staff from new international markets where Zillow had not previously recruited. Nitka was tasked with demonstrating the viability and cost-efficiency of sourcing talent from these markets, leveraging its extensive expertise in international recruitment and its established professional network. By engaging Nitka, Zillow aimed to access new talent pools, gain a competitive edge, and optimize staffing costs.

2. Zillow emphasized the project's urgency and urged Nitka to begin the staffing process immediately. It instructed Nitka to mobilize resources rapidly, utilize proprietary recruitment methodologies, and apply its deep understanding of local labor markets to promptly meet Zillow's staffing needs.

3. Relying on Zillow's repeated representations that it was preparing a definitive written agreement between the parties to memorialize the parties' already-implemented understanding which would be forthcoming imminently, Nitka incurred significant expenses and

1

undertook substantial operational efforts in anticipation of the venture. Nitka deployed senior executives, specialized recruiters, and technical experts to oversee and execute the staffing process, ensuring all candidates met the high standards required by Zillow.

4. Additionally, in order to comply with Zillow's contract requirements, Nitka adjusted its insurance coverage, redirected resources from other projects, and incurred overhead costs to meet Zillow's demands. This included extensive market research, establishing local recruitment procedures, and conducting rigorous multi-tiered interviews to identify top-tier candidates.

5. Zillow accepted and benefited from Nitka's services by, *inter alia*, gaining significant insight from Nitka's market research and recruiting activities in unexplored South American markets. Nitka's efforts provided Zillow with invaluable knowledge about the talent landscape in these regions, labor market conditions, and logistical considerations. Even without finalizing the new hires that Nitka vetted, this information allowed Zillow to make more informed decisions about future staffing and market entry strategies, enhancing its competitive edge and operational efficiency. Nitka's contributions were integral to Zillow's broader business objectives, highlighting the indispensable value of their services.

6. After months of diligent work at Zillow's behest, and just as Zillow informed Nitka that the agreement was being circulated for signature, Zillow abruptly put the project and the contract on an indefinite hold.

7. In reliance on Zillow's representations, Nitka suffered substantial financial losses and missed business opportunities with other potential clients. Nitka made significant investment in the project, including identifying and recruiting specialized staff and strategic market

entry into new regions, providing lasting value to Zillow by enabling it to navigate these markets more effectively and independently implement similar staffing processes.

8. To address the damages suffered at the hands of Zillow, Nitka asserts claims for promissory estoppel, negligent misrepresentation, unjust enrichment, and quantum meruit.

## STATEMENT OF FACTS

### A. Parties

9. Plaintiff Nitka is a corporation duly organized and in good standing under the laws of the State of New York, with its principal place of business in Staten Island, New York. Nitka specializes in delivering technical and staffing solutions for large corporations worldwide.

10. Upon information and belief, defendant Zillow is a corporation organized under the laws of the State of Washington, with its principal place of business in Seattle, Washington.

### B. Jurisdiction and Venue

11. This Court has jurisdiction over this action under 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

12. Venue is proper in this district under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

### C. Factual Background

13. On October 12, 2022, Zillow requested Nitka's rate card for cost analysis for projects planned for 2023.

14. This solicitation initiated a series of communications and meetings pertaining to an engagement in which Nitka would provide specialized staffing services to Zillow.

15. Pursuant to the deal, Zillow would "engage a team ("Consultants") … from [Nitka] … to provide development and test services ("Services") pertaining to various Zillow projects on an ongoing basis." Nitka would be responsible for screening, interviewing, hiring, onboarding, and assigning Consultants to roles according to the metrics and requests provided by Zillow (the "Staffing" or "Staffing Process").

16. The communications culminated in a telephone conference on May 15, 2023, during which Zillow outlined specific metrics for Consultants and requested immediate action from Nitka.

17. On June 1, 2023, Zillow's procurement team hosted a more detailed meeting with Nitka, providing a list of countries from which Nitka was to source candidates, including Colombia, Costa Rica, Peru, and Uruguay.

18. Zillow had no presence or familiarity with these countries at the time, making Nitka the market tester.

19. Nitka explored these markets at Zillow's behest, allocating valuable resources and initiating candidate screening from the ground up.

20. Given Zillow's stated urgency, Zillow insisted that Nitka begin the Staffing Process immediately rather than wait until a formal contract was executed. Zillow represented to Nitka that a written agreement would follow.

21. Relying on Zillow's commitments and explicit representations, Nitka began engaging in the Staffing Process under Zillow's directives and adapted operational procedures accordingly. Zillow was also involved in the Staffing Process in parallel, as interviews were being scheduled and conducted.

22. On August 17, 2023, Zillow informed Nitka that it had been selected as the technical resources supplier for Zillow.

23. Accordingly, for several months until December 2023, Nitka invested a substantial amount of time and resources in undertaking the Staffing Process in accordance with Zillow's explicit direction.

24. The Staffing Process executed by Nitka was exceptionally intricate and resource-intensive, tailored to meet Zillow's high standards and the unique challenges of new, unfamiliar markets. Indeed, Zillow was involved and actively participated in every aspect and phase of the Staffing Process, approving and acquiescing to Nitka's effort to meet Zillow's instructions and demands. Nitka's efforts extended beyond basic recruitment; they encompassed a sophisticated, multi-stage approach to identifying potential candidates. This involved intensive search and outreach, detailed communication, provision of extensive information, and meticulous issue resolution to ensure that only the most suitable candidates were considered. Given the uncharted territory of these markets for Zillow, Nitka's process was crucial for maintaining quality, cost-effectiveness, and fostering trust and relationships, often requiring weeks of sustained effort and engagement.

25. Nitka's approach to candidate evaluation was multi-tiered and designed to ensure technical proficiency and align with Zillow's corporate objectives. The initial stage involved live interviews focusing on an in-depth analysis of soft skills, motivation, and English language proficiency, essential for quality assurance and market viability. Nitka's HR specialists then conducted comprehensive reviews, meticulously verifying resumes and technical competence. This process, conducted in an environment where Zillow had no prior experience, demanded an exceptionally high level of diligence and selectivity. Candidates who met these

5

rigorous standards were subjected to even more specialized assessments designed to evaluate their technical prowess and suitability for the specific roles within Zillow's projects.

26. The "technical interviews" were particularly exhaustive and technically sophisticated. Each session required extensive preparation, close coordination with team leads, and a systematic approach to candidate scrutiny. These interviews typically spanned four hours and engaged two to three Nitka specialists per candidate, reflecting the depth of assessment necessary to ensure only the highest quality candidates were selected. Nitka meticulously documented feedback from each interview, maintaining a transparent and thorough evaluation process. This rigorous approach ensured the selection of top-tier candidates and helped Zillow assess the viability of tapping into these new markets for future talent sourcing.

27. On October 27, 2023, Zillow reiterated the urgency of the project to Nitka, stating:

> In interest of speed and to allow Brian Short and Rakhee to focus on some other priority Zillow deals we have on our radar, I am temporarily relocating them to the cc line on this; I will work directly with you and with Anna. I will loop them back in to support additional steps if/when needed.

28. Indeed, Zillow's project manager, Brian White, was so fixated on pushing this deal through that he emailed his internal support, stating:

> In interest of time, do you believe based on your read that I can guide Nitka to focus on either Costa Rica or Colombia, and that in either case we might have some supplemental language but that we "will likely be able to get sign off?" Given the time crunch I am trying to work items in parallel to max extent possible, so hence the Q.

29. On October 31, 2023, Leon Miskin, CEO of Nitka, discussed the updated list of resources required for the projects with Anna Dorofiyenko, Zillow's VP of Data Services.

30. On November 3, 2023, Zillow provided additional information to facilitate and expand the Staffing Process:

> As the Legal team continues its work, I want to follow up with you in parallel on an additional resource type which I believe Anna may have discussed with you at some point – a Business Systems Analyst. (See attached JD). Based on Anna's direction to me, we would like you to assess your resource quality and capacity for this resource type. We are anticipating folding this resource into the SOW (I will work it into the SOW as a redline once Legal gets me their updated draft docs, then we will get to you for review). I still need to circle up with Anna on HC quantities by resource type, but also stand by for more intel on that front as well. Action item for Leon: Assess your talent bench, and pls provide some sample CVs for review for that resource type.

31. On November 4, 2023, Zillow revised the list of approved countries for sourcing candidates, narrowing the focus exclusively to Costa Rica. This change required Nitka to discontinue its search efforts in the other countries that Zillow had initially instructed them to explore, leading to considerable sunk costs. This adjustment disrupted Nitka's recruitment strategy and resulted in the loss of resources and investments already dedicated to the broader search.

32. On November 6, 2023, Zillow specifically instructed Nitka to collaborate with Anna Dorofiyenko to ensure her continued involvement in the Staffing Process, as Dorofiyenko was project lead and was eager to maintain momentum:

> Pls ensure Anna continues to have the opportunity to evaluate and approve the potential resource/talent profiles.

33. To that end, on November 13, 2023, Nitka continued to update Dorofiyenko on the Staffing Process:

> As per your request attached are some candidates from our current pipeline in CR. They all went through the initial interviews with our HR team and are ready for the final interview.

34. On December 14, 2023, Zillow instructed Nitka to proceed with further "final-round" screening, emailing Nitka: "Let's do tech interviews."

35. Between May 2023 and December 2023, Nitka conducted an extensive number of interviews – 333 HR interviews and 81 technical interviews – demonstrating a significant investment of time and resources toward fulfilling Zillow's Staffing demands.

36. By the end of December 2023, Nitka had incurred approximately $1,244,150 in costs related to the Staffing Process. This figure includes both direct and overhead costs. Direct costs include the engagement of high-level executives such as the CEO, CTO, and COO, as well as multiple HR recruiters, data scientists, and heads of technical teams, all of whom were involved at varying levels throughout the process. Overhead costs include, but are not limited to, expenses related to facilities, utilities, and administrative support. These overhead costs are actual and out-of-pocket expenses that are usually allocated to specific projects by Nitka's standard cost accounting practices, including but not limited to (i) facilities expenses: rent, utilities, and maintenance costs of the office space used for the Staffing Process; (ii) administrative support: salaries and wages of administrative personnel who supported the Staffing Process; and (iii) operational expenses: costs related to office supplies, software licenses, and other operational necessities required to meet Zillow's demands.

37. Indeed, Nitka quickly mobilized its resources, employing proprietary recruitment methods and leveraging its knowledge of local labor markets to meet Zillow's urgent staffing needs, aiming to tap into new talent pools for a competitive advantage and cost optimization. In reliance on Zillow's repeated assurances that a written expression of their already-implemented agreement was forthcoming, Nitka incurred significant expenses, deployed senior executives and specialized recruiters to oversee the rigorous staffing process, adjusted insurance coverage, reallocated resources, and conducted extensive market research.

38. This extensive investment by Nitka in conducting interviews and performing the other actions described herein, all of which enriched Zillow at Nitka's expense, was made in reliance on Zillow's directions and promises of an impending contract.

39. On December 27, 2023, Brian Short informed Nitka that Zillow merely needed internal approval and a signature to finalize the contract. Nitka reasonably relied on these representations.

40. On January 4, 2024, Zillow scheduled additional interviews with Nitka.

41. The very next day, January 5, 2024, Zillow's Brian Short suddenly inquired about the cost of the initial ramp of resources and the expectation that the number of resources would start immediately upon contract signing.

42. This came as a surprise to Nitka. Short followed by asking whether there was "another email thread where interviews are being scheduled and approval for hiring."

43. Nitka advised Short that, in fact, at least four Zillow employees had been working through the Staffing Process for months.

44. On January 11, 2024, Short abruptly informed Nitka that Dorofiyenko was leaving the company. Short acknowledged that he knew Nitka was far along in the Staffing Process and waiting for contract signature, but stated that the engagement was "on hold for now" and asked that Nitka "hold off on sourcing/screening more people" pending the change in leadership. Zillow was aware of Nitka's heavy investment into the project at this juncture and that Nitka had done so at their insistence.

45. The stress induced in Miskin as a result of Zillow's abandonment of the deal caused him to be admitted to the hospital on January 15, 2024, for emergency treatment of acute cardiac conditions that precede a heart attack.

46. On January 19, 2024, Short and Miskin had a phone call in which they agreed that Nitka would continue to screen for data engineers in Costa Rica to ensure a pipeline of candidates was ready to go when Zillow was ready. This call was memorialized in an email from Miskin on January 22, 2024.

47. Nitka seeks damages including compensation for the aforementioned wages paid to staff, opportunity costs, overhead, and shutdown expenses.

48. Additionally, due to Zillow's urgent staffing demands, Nitka incurred substantial overhead costs. These costs were associated with the extensive use of its resources for recruitment, screening, and onboarding activities, which included reallocating personnel, increasing administrative support, and expanding operational capacity.

49. The resources necessarily expended to meet Zillow's demands significantly disrupted Nitka's regular operations. This disruption diverted attention and resources away from other projects and resulted in missed business opportunities and lost revenue. Nitka estimates that the financial impact of these lost opportunities amounts to at least $3,000,000 for 2024.

50. Nitka's extensive investment in reliance on Zillow's representations was made in good faith and pursuant to Zillow's explicit directions and promises. Zillow accepted Nitka's services by prompting the Staffing Process to begin and continue pending execution of a promised formal written agreement and by providing assurances of an impending contract. Zillow benefitted from Nitka's market research and recruiting activities provided to Zillow for multiple new South American markets that were previously unexplored. Nitka reasonably expected compensation for these services, as indicated by promises and expectations of a forthcoming contract.

51. The size of Nitka's losses demonstrates its substantial commitment and reliance on Zillow's statements and the extensive harm caused by Zillow's failure to honor its promises. Nitka's significant financial losses and opportunity costs underscore the detrimental impact of Zillow's actions and the necessity for just compensation for the services rendered.

## **FIRST COUNT: PROMISSORY ESTOPPEL**

52. Plaintiff re-alleges and incorporates by reference all allegations contained in Paragraphs 1 through 51 of this Complaint as if fully set out herein.

53. Zillow explicitly instructed Nitka to begin the Staffing Process immediately, assuring that a contract would be finalized later.

54. Based on Zillow's directives, Nitka commenced recruitment on May 16, 2023, incurring costs and redirecting resources to meet Zillow's urgent demands.

55. Throughout the process, Zillow repeatedly assured Nitka of the impending contract finalization, prompting Nitka to continue its extensive efforts.

56. On December 6, 2023, Zillow provided final, clean execution versions of the memorialized agreement, and made it clear that internal approval was imminently forthcoming, continuing to mislead Nitka.

57. Based on Zillow's directives and assurances of an imminently forthcoming contract (and payment), Nitka took foreseeable substantial steps, incurred significant costs and expenses, and redirected resources to meet demands. Nitka reasonably relied on Zillow's promises in good faith and performed the services as demonstrated by:

   a. The initiation and continuation of the Staffing Process beginning May 16, 2023.
   b. The expenditure of significant resources, including over $800,000 by January 2024, in recruiting, screening, and preparing candidates for Zillow's projects.

11

   c. Adjusting insurance coverage to meet Zillow's requirements.
   d. Redirecting resources and incurring opportunity costs by focusing on Zillow instead of other clients.

58. Zillow accepted and utilized these services, deriving significant benefits from the proof of concept that Nitka's market research and recruiting activities provided for South American markets that were previously unknown to it. Nitka's extensive efforts in exploring these new markets, establishing procedures for local labor markets, and conducting rigorous multi-tiered interviews offered Zillow invaluable insights into the viability and cost-efficiency of sourcing talent from these regions. Even without finalizing hires, Zillow gained critical knowledge about the talent landscape, labor market conditions, and logistical considerations in these countries. This strategic intelligence positioned Zillow to make more informed decisions about future staffing and market entry strategies, thereby gaining a competitive edge and optimizing its operational efficiencies. Nitka's services were instrumental in unveiling these opportunities and potential challenges, making their contribution indispensable to Zillow's broader business objectives.

59. As late as December 14, 2023, Zillow made it explicitly clear that it wished to proceed with more final-round screening, demanding: "Let's do tech interviews."

60. Despite Zillow's assurances and Nitka's compliance with all directives, on January 5, 2024, Zillow put the deal on an indefinite hold, causing significant financial harm to Nitka.

61. Due to Zillow's failure to honor its promises, Nitka suffered substantial financial losses, including:

   a. Wages paid to staff engaged in the Staffing Process.
   b. Costs incurred in candidate sourcing, screening, and interviewing.
   c. Costs from initially approved but subsequently excluded sourcing locations.
   d. Lost business opportunities due to the reallocation of resources to meet Zillow's demands.

62. It would be unjust (and against equity and conscience) to allow Zillow to avoid liability and retain the benefits of inducing Nitka to undertake significant efforts and expenses based on promises that Zillow failed to honor.

63. Accordingly, Nitka seeks an award of general damages to compensate for the value of the services rendered to Zillow, including wages paid to staff, recruitment expenses, and overhead costs incurred due to the Staffing Process. Nitka also seeks special damages for the financial losses caused by Zillow's failure to honor its promises, which include costs incurred in candidate sourcing, screening, and interviewing, as well as costs from initially approved but subsequently excluded sourcing locations and lost business opportunities due to the reallocation of resources to meet Zillow's demands. Additionally, Nitka seeks compensation for the estimated lost business opportunities and revenue, projected to be approximately $3,000,000 for 2024. Finally, Nitka requests any other relief deemed just and proper by the Court to prevent Zillow from retaining benefits without compensating Nitka for its significant efforts and expenses based on Zillow's unfulfilled promises.

**SECOND COUNT: NEGLIGENT MISREPRESENTATION**

64. Plaintiff re-alleges and incorporates by reference all allegations contained in Paragraphs 1 through 63 of this Complaint as if fully set out herein.

65. Zillow represented to Nitka that a contract would be finalized when it directed Nitka to start work on the Staffing Process without delay. Zillow consistently asserted that the finalization of the contract was imminent, including by providing final contract versions on December 6, 2023 and instructing Nitka to schedule and conduct further technical interviews. Zillow knew or should have known that these representations were misleading, particularly given the internal communications within Zillow leading to its eventual abandonment of the deal.

66. Zillow knew or should have known that it might not proceed with the project, given that some of its project managers were pushing the Staffing Process forward while others were hesitating and still in the process of formulating Staffing requirements.

67. Zillow had a duty to give accurate information due to a special relationship created by its solicitation of Nitka's services. This special relationship arose from Zillow's control over the Staffing Process, its specific directives, and Nitka's substantial commitment of resources based on Zillow's assurances, of which Zillow was aware.

68. Zillow breached its duty of care by failing to ensure the accuracy of its representations about the contract's finalization and by instructing Nitka to incur significant costs based on its assurances.

69. Further, Zillow knew that Nitka desired the information supplied in its representations for a serious purpose: to undertake substantial Staffing efforts, which required significant costs in preparation for the anticipated partnership. Zillow's repeated assurances of an imminent contract induced Nitka to take immediate and extensive action to further this purpose.

70. Nitka justifiably and reasonably relied upon Zillow's representations, as evidenced by Nitka's swift initiation of the Staffing Process upon Zillow's instruction, significant financial investment in recruiting, screening, and preparing candidates, and adjustments to its insurance coverage and other operational aspects to meet Zillow's demands. Zillow was aware of all or substantially all of Nitka's actions and explicitly encouraged Nitka's reliance.

71. Nitka reasonably relied on Zillow's representations to its detriment, resulting in substantial financial harm. This harm includes wages paid to staff engaged in the Staffing Process, costs incurred in candidate sourcing, screening, and interviewing, sunk costs

from initially approved but subsequently excluded sourcing locations, and lost business opportunities due to the reallocation of resources to meet Zillow's needs.

### THIRD COUNT: UNJUST ENRICHMENT

72. Plaintiff re-alleges and incorporates by reference all allegations contained in Paragraphs 1 through 71 of this Complaint as if fully set out herein.

73. Zillow benefited from Nitka's extensive staffing efforts and resources, which included recruiting, screening, interviewing, and preparing numerous candidates to meet Zillow's specific staffing requirements and providing proof of concept for new South American markets.

74. Nitka invested substantial time, effort, and financial resources into the Staffing Process, incurring costs exceeding $1,244,150. This included deploying high-level executives, HR recruiters, data scientists, and heads of technical teams.

75. Between May 2023 and December 2023, Zillow repeatedly assured Nitka that a written contract was forthcoming, inducing Nitka to continue its staffing efforts under the belief that Zillow would compensate Nitka for its services.

76. Despite these assurances, Zillow failed to finalize the contract and, ultimately, abandoned the deal, thereby retaining the benefits of Nitka's efforts without providing compensation.

77. Zillow accepted and utilized Nitka's services, gaining significant benefits from the proof of concept provided through Nitka's market research and recruiting activities in previously unexplored South American markets. Nitka's efforts offered Zillow invaluable insights into the talent landscape, labor market conditions, and logistical considerations of these regions. Even without finalizing hires, this knowledge enabled Zillow to make more informed decisions

about future staffing and market entry strategies, giving it a competitive edge and optimizing operational efficiencies. Nitka's contributions were crucial to Zillow's broader business objectives, demonstrating the indispensable value of their services.

78. As a direct and proximate result of Zillow's unjust enrichment, Nitka has suffered substantial financial harm. Nitka seeks restitution for the reasonable value of the benefits conferred upon Zillow, totaling at least $1,244,150, which includes the value of market research and strategic insights provided. Additionally, Nitka seeks special damages for lost business opportunities and revenue, estimated at $3,000,000 for 2024, due to the reallocation of resources to meet Zillow's demands.

79. Zillow continues to benefit from the competitive edge gained through Nitka's market research and recruiting activities. The insights and strategic intelligence provided by Nitka allow Zillow to navigate these new markets more effectively and implement similar staffing processes on its own, potentially at a lower cost, by leveraging Nitka's proprietary methodologies. This ongoing benefit further underscores the inequity of Zillow retaining these advantages without just compensation to Nitka.

80. It would be inequitable and unjust for Zillow to retain the significant benefits of Nitka's staffing services and resources without just compensation. Accordingly, Nitka seeks general and special damages to rectify the substantial financial harm caused by Zillow's unjust enrichment.

## FOURTH COUNT: QUANTUM MERUIT

81. Plaintiff re-alleges and incorporates by reference all allegations contained in Paragraphs 1 through 80 of this Complaint as if fully set out herein.

82. Nitka provided indispensable staffing services to Zillow, including identifying, screening, interviewing, and onboarding candidates to meet Zillow's urgent project needs. Nitka also provided proof of concept regarding new South American markets, which Zillow accepted and benefited from.

83. These services were rendered in good faith and at Zillow's explicit direction and request, under the reasonable industry-standard expectation of remuneration based on Zillow's representations that a formal contract was imminent.

84. Zillow accepted and benefited from Nitka's services, as evidenced by the extensive involvement of Zillow's project managers and the detailed coordination of the Staffing Process.

85. Nitka's reasonable, industry-standard costs, including over $800 per technical interview and a total investment exceeding $1,244,150, underscore the value and necessity of the services provided to Zillow.

86. Nitka is entitled to compensation for the indispensable services rendered to Zillow, as it would be unjust for Zillow to benefit from these services without payment.

87. Nitka is entitled to recover overhead expenses incurred as part of the Staffing Process. Nitka has a demonstrable history of ongoing business operations, and the overhead costs are normally allocated to specific projects in accordance with Nitka's standard cost accounting practices.

88. These practices involve systematically apportioning indirect costs based on the level of activity and resources dedicated to each project, ensuring all projects bear a fair share of common expenses, such as facilities, utilities, and administrative support.

89. Therefore, these overhead costs are recoverable under the principles of quantum meruit.

90. Nitka is entitled to compensation for the reasonable value of the services rendered, as it is unjust for Zillow to avoid payment after inducing Nitka to undertake significant efforts and incur substantial expenses based on Zillow's promises.

(Intentionally left blank.)

**WHEREFORE**, Plaintiff Nitka, Inc. respectfully requests that this Court enter judgment in its favor and against Defendant Zillow, Inc., and grant the following relief corresponding to each cause of action:

(i) FIRST COUNT: PROMISSORY ESTOPPEL
   a. Compensatory Damages: Award compensatory damages to Plaintiff in an amount to be determined at trial but no less than $1,244,150, representing the direct expenses incurred by Plaintiff in reliance on Defendant's promises, including wages paid to staff, recruitment expenses, and overhead costs incurred during the Staffing Process.
   b. Special Damages: Award special damages to Plaintiff for the financial losses caused by Defendant's failure to honor its promises, including but not limited to: (i) costs incurred in candidate sourcing, screening, and interviewing, including sunk costs from initially approved but subsequently excluded sourcing locations; and (ii) lost business opportunities due to the reallocation of resources to meet Defendant's demands, estimated to be at least $3,000,000 for the year 2024.

(ii) SECOND COUNT: NEGLIGENT MISREPRESENTATION
   a. Compensatory Damages: Award compensatory damages to Plaintiff for the harm suffered due to Defendant's negligent misrepresentations, including costs incurred in candidate sourcing, screening, and interviewing, wages paid to staff, and overhead costs.
   b. Special Damages: Award special damages to Plaintiff for lost business opportunities and other financial losses caused by Defendant's negligent misrepresentations, estimated to be approximately $3,000,000 for the year 2024.

(iii) THIRD COUNT: UNJUST ENRICHMENT
   a. Restitution for Unjust Enrichment: Award restitution to Plaintiff for the reasonable value of the benefits conferred upon Defendant, including the value of market research, strategic insights, and staffing services provided, which have given Defendant a continuing competitive advantage and operational efficiencies.
   b. Special Damages: Award special damages to Plaintiff for lost business opportunities and revenue, estimated to be at least $3,000,000 for 2024, due to the reallocation of resources to meet Defendant's demands.

(iv) FOURTH COUNT: QUANTUM MERUIT
   a. Compensatory Damages: Award compensatory damages to Plaintiff for the reasonable value of the services rendered, including over $800 per technical interview and a total investment exceeding $1,244,150, reflecting the value and necessity of the services provided to Defendant.

(v) GENERAL RELIEF
   a. Prejudgment and Post-judgment Interest: Award Plaintiff prejudgment interest on all sums awarded from the date of the commencement of this action until the date of judgment and post-judgment interest thereafter, at the maximum legal rate.

    b. Costs and Attorneys' Fees: Award Plaintiff the costs of this action, including reasonable attorneys' fees and expenses incurred in prosecuting this lawsuit.
    c. Punitive Damages: Award punitive damages to Plaintiff in an amount sufficient to punish Defendant for its willful, wanton, and malicious conduct and to deter similar conduct in the future.
    d. Equitable Relief: Grant such other and further equitable relief as the Court deems just and proper, including but not limited to an order compelling Defendant to compensate Plaintiff for the continuing benefit derived from Plaintiff's market research and staffing services.
    e. Any Other Relief: Grant Plaintiff any other relief the Court deems proper and equitable under the circumstances. Plaintiff seeks this relief to ensure that Defendant does not unjustly retain the benefits conferred by Plaintiff's substantial efforts and to fully compensate Plaintiff for the significant financial harm suffered due to Defendant's actions.

Dated: New York, New York
       August 14, 2024

                         DAVIDOFF HUTCHER & CITRON LLP,
                         *Attorneys for Plaintiff*

                         By:  s/ Daniel Goldenberg
                              Daniel Goldenberg
                         605 Third Avenue
                         New York, New York 10158
                         (212) 557-7200
                         Fax (212) 286-1884
                         drg@dhclegal.com