1

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2

3    - - - - - - - - - - - - -    X

4    NITKA, INC.,                 :
                                           24-CV-5688(NG)
5            Plaintiff,           :

6
         -against-               :
7
                                          United States Courthouse
                                          Brooklyn, New York
8    ZILLOW, INC.,                :
                                          November 25, 2024
9            Defendant.          :        2:00 p.m.

10   - - - - - - - - - - - - -    X

11

12           TRANSCRIPT OF CIVIL CAUSE FOR PREMOTION CONFERENCE
                 BEFORE THE HONORABLE NINA GERSHON
13               UNITED STATES SENIOR DISTRICT JUDGE

     APPEARANCES:
14

15   For the Plaintiff:       DAVIDOFF HUTCHER & CITRON LLP
                              605 Third Avenue
16                            New York, NY 10016
                              BY:  DANIEL R. GOLDENBERG, ESQ.
17                                 ALEXANDER P. McBRIDE, ESQ.

18

19   For the Defendant:       BUCHANAN INGERSOLL & ROONEY PC
                              640 Fifth Avenue, 9th Floor
20                            New York, NY 10019-6102
                              BY:  STUART P. SLOTNICK, ESQ.
21

22   Court Reporter:          Andronikh M. Barna
                              225 Cadman Plaza East
23                            Brooklyn, New York
                              (718) 613-2178
24

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.

```
                           Proceedings                        2

 1          THE COURTROOM DEPUTY:  Civil cause for a premotion

 2   conference on Nitka vs. Zillow, Inc.  Docket No. 24-CV-5688.

 3          May I have the appearances for the Plaintiff,

 4   please.

 5          MR. GOLDENBERG:  Sure.

 6          Good afternoon, everyone.

 7          My name is Daniel Goldenberg from Davidoff Hutcher &

 8   Citron.

 9          THE COURT:  Is it Goldenberg?

10          MR. GOLDENBERG:  Goldenberg.  Yes, Your Honor.

11          THE COURT:  You don't have to lean over.  I think it

12   should pick up your voice.

13          Can you hear me?

14          MR. GOLDENBERG:  I can.

15          THE COURT:  Okay.

16          And with you?

17          MR. McBRIDE:  Good afternoon, Your Honor.

18          Alex McBride from Davidoff Hutcher & Citron as well.

19          THE COURTROOM DEPUTY:  Thank you.

20          For the Defendant.

21          MR. SLOTNICK:  Good afternoon, Your Honor.

22          I'm Stuart Slotnick from the law firm of Buchanan

23   Ingersoll & Rooney representing Defendant Zillow.

24          THE COURTROOM DEPUTY:  Thank you.

25          THE COURT:  Victor, do we have a new clock?
```

Proceedings                                              3

1          (Discussion off the record.)

2          THE COURT:  So, Counsel, let's take a first look at

3    this, the personal jurisdiction issue.

4          Mr. Slotnick, let me just begin with you.  Why

5    doesn't *Mallory* take care of this.

6          MR. SLOTNICK:  Because, Your Honor, *Mallory*

7    addresses a Pennsylvania statute.  The statute permitted

8    general jurisdiction in the case of a foreign business

9    corporation that registered to do business in that state.

10   New York State does not have a similar statute.  And, in fact,

11   that statute was rejected by Governor Hochul in 2023.  And I

12   can give Your Honor the name of the bill that was proposed.

13   It was Senate Bill S7476 in December 2023.

14         THE COURT:  So you're saying absent a statute, the

15   Supreme Court doesn't allow personal jurisdiction to be

16   determined by a consensual statement from a defendant?

17         MR. SLOTNICK:  I think what I'm saying is that just

18   *Mallory* doesn't apply because they talked about the

19   constitutionality of a statute that doesn't exist in New York.

20         In this case, the Defendant Zillow has its

21   headquarters and is incorporated in Washington State.  And

22   doing an analysis under *Daimler* and also under the

23   *Chufen Chen v. Dunkin' Brands*, there's no -- I don't believe

24   there are any exceptional circumstances in this case.

25         THE COURT:  Well, let's stay on the consent issue

```
                       Proceedings                    4
```

 1   first.  Okay?

 2          So, if the New York statute -- do you agree with

 3   Nitka that you do, in fact -- your client holds a

 4   New York State real estate brokerage license and that it

 5   actually says that every such license holder shall file an

 6   irrevocable consent to the jurisdiction of the courts of the

 7   state?

 8          MR. SLOTNICK:  So, I do agree that my client did

 9   sign that.

10          And there are a few points that are related to that.

11          First is, it's -- the consent is to the courts of

12   the State of New York, not the courts in the --

13          THE COURT:  You're going to exclude us here?

14          MR. SLOTNICK:  I am.

15          And I'm relying, Your Honor, on cases that consider

16   the very same.  That cases of the state means state court

17   versus cases in the state, which would include federal courts.

18          And what I am relying upon, and I quote, "a majority

19   of courts have held that," quote, "the courts of a state

20   refers only to state courts, and not to state and federal

21   courts.  And that case is *Beach v. Citigroup Alternative* and

22   it's a Southern District case, March 7, 2014.  It's 2014

23   Westlaw 904650.

24          There are other cases if Your Honor would like me to

25   put them on the record.

Proceedings                                              5

1          THE COURT:  No, it's not necessary because you need

2     to brief it.  When you brief it.

3          MR. SLOTNICK:  And additionally, Your Honor.  If I

4     may?

5          THE COURT:  Yes.

6          MR. SLOTNICK:  That not only does it say the states

7     of, but it's our position that signing a real estate licensing

8     form would not apply to general jurisdiction of every type of

9     case, particularly because the facts in this case don't arise

10    out of a real estate license and it would -- from our

11    position, it would be nonsensical that Zillow would consent to

12    general jurisdiction based on having a real estate license

13    when this case is really an issue that Zillow and Plaintiff

14    were in conversation with hiring staff.  And ultimately,

15    although it's not clear from the allegations in the complaint,

16    which is part of my problem, is that ultimately Plaintiff

17    would never have gone and paid for any of the work they've

18    done in the ramp-up to try and find staff until Zillow

19    actually hired one of the people that Plaintiff was seeking to

20    propose that Zillow hire, in which case they would be paid on

21    an hourly basis.  The employee would receive some sum of money

22    and then Plaintiff would also receive some sum of money.  So

23    this has nothing to do with a real estate license or buying or

24    selling real estate, although everyone knows that Zillow is,

25    in some sort of sense, in real estate.

Proceedings                                                6

1      THE COURT:  I have another question for you.

2      So insofar as we're talking about specific

3  jurisdiction and not general jurisdiction, to what extent do

4  you think this, what you acknowledge now is that your client

5  signed this form, to what extent might that play a part?  Or

6  are you saying what you just said answers that?

7      MR. SLOTNICK:  Well, I think Your Honor would look

8  at the facts.

9      THE COURT:  Yes.

10      MR. SLOTNICK:  And part of why I'm happy we're here

11  on a premotion conference is because I would prefer, if I

12  could, because I've been here before, to not make a motion to

13  dismiss and then have a request to amend the complaint because

14  the allegations are completely lacking, the jurisdictional

15  allegations are completely lacking in the complaint.

16      If Plaintiff would amend their complaint, and I

17  think that's probably the likely outcome, is that we make a

18  motion to dismiss and then they say, well, we want to now

19  amend --

20      THE COURT:  Let them amend now.

21      MR. SLOTNICK:  Why not amend now?  Because there are

22  no jurisdictional allegations.

23      THE COURT:  You're my kind of defense attorney.

24      Right.  Exactly.

25      MR. SLOTNICK:  I'm happy to hear that.

Proceedings                                   7

1        THE COURT:  An amendment now.

2        MR. SLOTNICK:  But my client would also, and any

3   client, probably on both sides, would be happy to be able to

4   get to the final complaint instead of taking a trip down the

5   road and then going back to the start line.

6        THE COURT:  All right.

7        How do you feel about that, Mr. Goldenberg?

8        MR. GOLDENBERG:  Good afternoon, Your Honor.

9        With respect to amending the complaint, generally

10  speaking, I agree with an efficient streamlined approach

11  always, Your Honor, for many reasons, including costs to my

12  client.  That being said -- and we've always demonstrated good

13  faith with Defendant's counsel to say if there's an issue,

14  specific issue, let's discuss it, let's resolve it before

15  having to go to the Court.

16       THE COURT:  Okay.

17       Could you just stand -- you don't have to bend down

18  into the microphone, but I think if you stand in front of it,

19  that would be better.

20       MR. GOLDENBERG:  Yes.  Okay.

21       THE COURTROOM DEPUTY:  You could actually move the

22  mic.

23       MR. GOLDENBERG:  Sorry about that, Your Honor.

24       THE COURT:  Okay.

25       MR. GOLDENBERG:  But before I proceed and make a

Proceedings                                      8

1    blanket statement and say sure, we'll amend, we would like --

2            THE COURT:  See if they want you to amend.

3            MR. GOLDENBERG:  Right.

4            And since we started --

5            THE COURT:  Fair enough.  Okay.

6            MR. GOLDENBERG:  -- with specific to general

7    jurisdiction, I really regret not printing the full statute

8    that we're talking about.  But if my memory serves me

9    correctly, it's -- and maybe Defendant's counsel has the full

10   language.  But after the ellipses that I put in, the statute

11   is very, very inclusive.  Its intent is very clear, from my

12   memory, that really the point of jurisdiction is a no-brainer

13   to me.  I think there's general jurisdiction.

14           I think the company Zillow, for many reasons, on top

15   of all of which are this one, the brokerage license speaks for

16   itself that there is general jurisdiction.  Zillow is a --

17   what's the word I'm thinking?  New York is a cornerstone for

18   its business.  You know, just the limited arguments that I put

19   in this letter I think speak for themselves.  In terms of

20   the -- so on the point of our jurisdiction allegations or

21   jurisdiction issues lacking to a point of motion to dismiss, I

22   do not think that even requires a fuller briefing at this

23   point.  But to the extent that it does, before just going back

24   to my client saying we need to start again, I would like an

25   itemized point of what they think is missing.

Proceedings                                        9

1          And then we haven't touched on the specific cause of

2    action or why they think we haven't failed -- we failed to,

3    you know, state a cause of action.  I could address that at

4    the next point of argument.

5          THE COURT:  Okay.

6          MR. SLOTNICK:  And, Your Honor, I would be happy to

7    respond to that, and I think I've already done partially.

8          But the allegations with regards to at least the

9    specific jurisdiction are lacking in that if you look at the

10   first paragraph, it says that my client approached Plaintiff.

11   That's all it says.  It doesn't say how.  My client is, you

12   know, as I said, based in Washington.  But how did they

13   approach them?  My understanding is there are no meetings in

14   New York whatsoever, nothing that happened in New York.

15         THE COURT:  Well, are you asking them -- normally

16   this would happen in an affidavit on personal jurisdiction.

17   But if the Plaintiff is willing, you can put it in the

18   pleading, to put him -- I interrupted you, Mr. Slotnick.  Go

19   ahead.

20         MR. SLOTNICK:  Thank you, Your Honor.

21         It's just that the complaint, when I read it, it

22   doesn't include several things, including that Zillow was

23   looking to exploit a South American market, not a New York

24   market.  And my understanding, which is not in this complaint,

25   is when Zillow spoke to the people at Plaintiff, they were in

Proceedings                                    10

1    Europe when they were speaking to them and so there's some

2    e-mails here.  I don't, I just, I don't think it's sufficient

3    to form a specific jurisdiction basis.

4                THE COURT:  Okay.

5                So let's turn to the second round, your 12(b)(6)

6    motion.  There are particular things that you would like to

7    point to that you feel are missing in the complaint to state a

8    claim and that the Plaintiff then could amend if so able.

9                MR. SLOTNICK:  Thank you.

10               So I think the overall impression that one gets when

11   reading this complaint, which is full of vagaries, is that

12   Plaintiff was trying to build infrastructure to exploit an

13   opportunity that Zillow had.  And it's all over the complaint

14   that this was going to be subject to a written agreement that

15   never materialized.  And I will just give a couple of

16   examples.

17               In paragraph 3, it's written that Zillow was

18   preparing a written agreement.

19               In paragraph 5, they didn't finalize any hires.

20               And there are many more, but I'm skipping.

21               In paragraph 28, Zillow says, according to the

22   complaint, that they're likely to get sign-off on the project,

23   which is in October of 2023.  This whole negotiations ends

24   soon thereafter.

25               In paragraph 30, Zillow is assessing Plaintiff's

Andronikh M. Barna, Official Court Reporter, RPR, CRR

1    capacity to do the job.

2            And very importantly, in November, on November 23rd

3    of 2023, which is a year ago, they discuss a scope of work and

4    they say, oh, we're going to add something into the scope of

5    work that was never finalized.  So, it means it wasn't done.

6            And then on -- also in November, there were country

7    lists of where these people, these hires, potential hires

8    would come out of, all in South America, and they talk about

9    they're revising the country list.  So, this understanding

10   that they have going on to form the basis of any claims

11   doesn't exist.

12           And in paragraph 37, Zillow says a written agreement

13   is forthcoming, which means it doesn't exist at that point in

14   time.

15           And when you read the complaint, Your Honor, you see

16   that this discussion about the project comes to a very quick

17   end, at which point Plaintiff for the first time says, oh, by

18   the way, you now owe us millions of dollars.  There was never

19   any discussion of expenses beforehand, at least not that I can

20   see in the complaint, that -- and now they're in court saying

21   you owe us $4.2 million.

22           THE COURT:  Now, where does -- are you finished or

23   no?

24           MR. SLOTNICK:  Well, I have a little more,

25   Your Honor.

```
                          Proceedings                    12

 1            THE COURT:  Go ahead.

 2            MR. SLOTNICK:  So with regards to the promissory

 3    estoppel to pay all these expenses, there has to be notice of

 4    these expenses.

 5            And I think what happened, and this is based on my

 6    reading of the complaint, is Nitka, Plaintiff, said we have an

 7    opportunity and we will do whatever we can to try and exploit

 8    it.

 9            But Zillow never had an agreement.  It never said:

10    Incur these costs and we'll reimburse you.

11            And it's not in -- it's nowhere in here that they

12    indicate -- even though they quote tons of e-mails and

13    characterize, they don't say:  We told Zillow we've spent

14    $250,000 at this point, we just want to make sure.

15            Because what they -- what Plaintiff says is:  We

16    need you to -- we need to be able to turn this on very

17    quickly.  We need to be able to flip the switch very quickly.

18            And so, what Plaintiff is doing is they're building

19    an infrastructure unbeknownst, at least from the reading, to

20    Zillow.

21            And there's no point where Plaintiff says:  Hey, now

22    we're at $500,000, we just want to make sure you are going to

23    pay us back.  Hey, now we're at a million dollars of expenses

24    even though you're telling us an agreement is coming.

25            They were not promised the work.  They were promised
```

Proceedings                                                    13

1    an agreement to do the work.

2            And at which point, if the agreement was handed to

3    Plaintiff, it's very likely that Plaintiff would have said:  I

4    can't agree to these terms.  And the whole thing would have

5    ended.

6            What they're actually seeking is more than they

7    would have gotten if an agreement was finalized and they

8    signed it.  And they're just saying, well -- I think what

9    happened is Plaintiff gave it their -- a shot to throw their

10   hat in for the running for a project.  And then, when it

11   didn't work out, they say:  Well, now you have to pay for

12   everything.

13           THE COURT:  Let me ask you a question.

14           Does anyone know why it didn't work out?

15           And the second question:  Is there any possibility

16   that these two parties might, in fact, want to work together?

17           MR. SLOTNICK:  I don't have the answer certainly to

18   the latter question.

19           THE COURT:  Okay.

20           MR. SLOTNICK:  And it's not clear from the complaint

21   why it don't work out.  They just said -- I think in one of

22   the paragraphs they said --

23           THE COURT:  Well, somebody in this room might know.

24           MR. SLOTNICK:  Someone left.  Someone from Zillow

25   left and communicated to Plaintiff and they said the project

Proceedings                                  14

1    that never started was shut down because Zillow actually never

2    hired any of the employees that Plaintiff was going to suggest

3    for them.

4           If Zillow did hire the individuals, these staff

5    people, then potentially there would be a claim because then

6    they -- then Zillow had a benefit that they hired these

7    people.  But it never got off the ground.

8           THE COURT:  Okay.

9           All right.  Mr. Goldenberg.

10          MR. McBRIDE:  Your Honor, this is Alex McBride.

11   I'll jump in and maybe Mr. Goldenberg can elaborate more on

12   the specifics.

13          Actually, if you read this complaint, it's very

14   detailed on a pattern of Zillow representing to our client to

15   start interviewing and staffing up these resources in these

16   other countries.

17          And, you know, we can just go to paragraph 33.  To

18   that end, on November 13, 2023, Nitka continued to update

19   employee of Zillow in the staffing process.

20          November 14, 2023, next paragraph.  Zillow instructs

21   Nitka to proceed with further final-round screening.

22   E-mailing Nitka:  Let's do tech interviews.

23          This is the timeline.  They keep ramping up.  So

24   this notion that Zillow was ignorant of what we were doing is

25   completely belied by the complaint allegations.

Proceedings                                    15

1          Then at paragraph 44.  We're settling into this year

2    after all this work for Zillow.  Our lead contact at Zillow

3    suddenly leaves the company.  We're told to, quote, hold off

4    on sourcing and screening more people.  More people.

5          THE COURT:  Okay.

6          And do you know what happened other than this person

7    left?  Did someone else take over?

8          MR. GOLDENBERG:  So, this dovetails into the point

9    that I think discovery would yield a lot of information on

10   this issue.

11         But I do -- I have my suspicions that it might have

12   something to do with the -- just an internal change and the

13   person who was first responsible for this project, and this

14   was well further down the line than Plaintiff's counsel --

15   Defendant's counsel says, which is that we threw our hat in

16   the rink.  Our hat, we never -- there was a rink to be thrown

17   in, but we were chosen to proceed to this place.  There was

18   no -- at this -- after that initial approach, we -- there was

19   communication and then there was I think an RFP and we were

20   selected for the RFP and so on and so forth and went through

21   the regular business.  So we weren't competing at this point

22   with other businesses.  We were the business they were

23   proceeding with.  That's why we were ramping up and scheduling

24   interviews.

25         And then at some point well after this ramping up

Proceedings                                        16

1  process, this actual really performing the services process,

2  Zillow for whatever reason decided -- and I have my suspicions

3  I don't want to go on record for, but I think discovery will

4  show this, but they changed course.  And the person

5  responsible for it left, whether consequentially or not, left

6  and they -- maybe they saw that, oh, you know, we want to go

7  in a different direction, they cut it off and then we were

8  kind of left hanging in the basket.

9          There is something to be said that -- and Plaintiff

10 has informed me and it will come out again in discovery or

11 deposition -- it damaged us more beyond even these costs

12 because our reputation, obviously.  When you're looking for

13 staff and doing interviews and suddenly you find out that this

14 company that, you know, people go through all these rounds of

15 interviews and suddenly you cut off and nobody knows why, now

16 we're not a trustworthy source from both ends.

17          MR. McBRIDE:  Your --

18          MR. SLOTNICK:  Your Honor.

19          Okay.  I'm sorry.

20          MR. McBRIDE:  Just one quick point.

21          I mean, just taking a step back.  I mean, the facts

22 alleged here, we think -- and we will amend if we need to with

23 more detail, but we think, as alleged now, are the hallmark of

24 these type of quasi-contract claims.  We were misled into

25 doing all this work with assurances the deal would be

Proceedings                                        17

1   consummated.  I know that there are reasonable reliance

2   arguments, Your Honor; that's a fact issue.  But we've alleged

3   the elements of promissory estoppel, we've alleged the

4   elements of unjust enrichment and quantum meruit, at least on

5   plausibility standard we believe to get to the next phase of

6   the case.  That's what this case is about.

7          We're not denying that there was no final written

8   agreement entered; we agree with that.  But that's not the

9   claims.  The claims we're bringing are quasi-contract claims.

10         MR. SLOTNICK:  So, Your Honor, I just want to

11  respond to a few things, if I may.

12         You know, Counsel read certain allegations in the

13  complaint in which they said, oh, Zillow knew what was going

14  on.  There clearly was communication with Zillow about the

15  process and there clearly was communication about the fact

16  that there was not a deal and that one would be provided.

17         And Counsel just said that they were misled that a

18  deal would be consummated, and I don't think that's in the

19  complaint.  I don't, I don't think it's in any e-mails because

20  they didn't include it.  And had this been a situation, that

21  clearly would have been in writing somewhere.  And they would

22  have said:  Hey, at this point we've spent over a million

23  dollars, we just want to clarify or get some assurance.  I

24  think what they did was really a loss leader and they were

25  trying to get business.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                              18

1          But ultimately, they -- my client was not ignorant

2    as to the fact that Plaintiff was trying to get this project.

3    What my client certainly was ignorant about was how much money

4    was spent.

5          And I just heard for the first time that there was

6    an RFP and that Plaintiff won it.  I have never heard that

7    before.  It's not in the complaint.  In fact, it's

8    contradicted by the first paragraph of Plaintiff's complaint

9    where it says that Zillow approached and contacted Plaintiff.

10   If there was an RFP, I would bet that that would be included

11   in the complaint.

12         So, many of the allegations belie common sense.  And

13   the reason that there are such vagaries here is because I

14   think the details, if they were here, would expose what this

15   is.  And it's -- there's no claim.

16         THE COURT:  All right.  Counsel, let me ask again.

17         You said, Mr. Slotnick, that you don't know and you

18   have to ask your client whether there is any interest among

19   the parties in restoring this project.  It's not that old.

20         Is there any interest on the Plaintiff's part?

21         MR. GOLDENBERG:  Plaintiff, absolutely, is ready for

22   business any time.

23         Obviously, there's emotional damage a little, but

24   Plaintiff's counsel has always came with an open hand and --

25         THE COURT:  But is the Plaintiff?

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                                    19

1        MR. GOLDENBERG:  Plaintiff.  That's what I meant.

2   Plaintiff is, yes.

3        THE COURT:  Okay.

4        MR. GOLDENBERG:  Always room to talk.

5        THE COURT:  So I do think that one of the first

6   things the parties ought to think about is whether or not this

7   is a project that the Defendant, in fact, may have an interest

8   in and then resolution could occur as part of, you know,

9   restarting your business negotiations.  I have no idea if

10  that's doable or not, but I think that that should be number

11  one that you think about.

12       So, I think Mr. Slotnick has given you his thoughts

13  as to what he thinks is missing from the complaint.  It's up

14  to you to decide what it is that you want or need to put into

15  an amended complaint.  And we can set a date for you to do

16  that.

17       But the next thing that I wanted to talk to you

18  about was discovery.  As you saw in my minute entry setting

19  this up, I didn't see why discovery should be stopped during

20  the pendency of this motion.  And I notice that you have a

21  joint motion to stay in front of the magistrate judge.  I did

22  not read the papers, but I don't know what that's about and

23  why there should be any stay here.  It's not my general

24  practice to stay discovery on a motion to dismiss, a proposed

25  motion to dismiss, unless I am quite confident that the motion

Proceedings                                    20

1   to dismiss is a slam dunk, and I have not reached that

2   conclusion in this case.  So I think that discovery should

3   proceed even if both sides don't want to.

4           Go ahead.

5           MR. GOLDENBERG:  I'm sorry, Your Honor.

6           To the extent there was a -- Defendant's counsel

7   reached out about extending the time pending the motion.  I

8   only agreed to it because I was conducting a jury trial for

9   the past two weeks, so I -- there was a date for the 19th to

10  have a joint conference.  We ended up having one on Friday --

11          THE COURT:  Oh, okay.

12          MR. GOLDENBERG:  -- with a colleague.

13          THE COURT:  I didn't know that.

14          MR. GOLDENBERG:  I'm more than happy to proceed with

15  discovery.  Jury trial is over.

16          THE COURT:  What happened at your conference then?

17  I don't think I knew there was a conference.

18          MR. GOLDENBERG:  We had with your colleague Natalie.

19          MR. SLOTNICK:  Natalie.

20          MR. GOLDENBERG:  Yeah.

21          We just discussed --

22          MR. SLOTNICK:  I think there was a conference

23  scheduled with the magistrate for December 5th at 11:00 a.m.

24          And one thing I think it's --

25          THE COURT:  Did you say December 5th?

Proceedings                                                  21

1          MR. SLOTNICK:  December 5th.  I believe 11:00 a.m.

2          THE COURT:  All right.  So that's good.  Okay.  All

3    right.

4          MR. SLOTNICK:  One thing, Your Honor, is, we have a

5    counterclaim that we haven't brought, obviously, at this

6    point.

7          But the parties also, I think, expressed a

8    willingness to try and negotiate something through the ADR

9    process.

10          But those are just two things that I wanted to raise

11   with the Court.

12          THE COURT:  All right.

13          Let me ask you this:  Would you rather go through

14   that process before there is an amended complaint?  Save some

15   more money if you can get it done quickly.

16          MR. SLOTNICK:  I would have to get approval from my

17   client, but I think the answer would be yes, Your Honor.

18          THE COURT:  So, do you want to mediate with the

19   magistrate judge or with our mediation program in the court or

20   a private mediator?

21          MR. SLOTNICK:  I don't think we would want to do a

22   private mediator.  I think it would be more cost effective to

23   do it within the court.

24          THE COURT:  Okay.

25          But do you mean with the MJ or do you want us to

Proceedings                                          22

1    issue a mediation order?

2              MR. SLOTNICK:  Either one would be acceptable.

3              THE COURT:  Who is our magistrate judge?

4              MR. GOLDENBERG:  Scanlon.

5              THE COURT:  Judge Scanlon?

6              MR. SLOTNICK:  Scanlon.

7              THE COURT:  Oh.  She is great.

8              I think you are going to see her on December 5th,

9    which is right -- well, it's next week.

10             MR. GOLDENBERG:  Mm-hm.

11             MR. SLOTNICK:  Coming up.

12             THE COURT:  Okay.

13             So, why don't we do this:  Why don't you advise

14   Judge Scanlon's office that based upon what happened at the

15   conference today before me, the parties would like to begin to

16   discuss settlement on December 5th, as well as anything else

17   you want to discuss.  Okay?

18             And so, you could do that by letter, a joint letter

19   to Judge Scanlon's office.  That would be helpful.  Okay?

20             And then I would say, Mr. Slotnick, you ought to

21   find out before then whether your client is or is not

22   interested in doing business with Nitka because that will

23   obviously be the first thing that you would want to know in

24   terms of trying to resolve this.

25             Can I leave it to counsel then, if it doesn't work

Proceedings                                          23

1  out, that you will reach some understanding on the schedule

2  for the filing of an amended complaint and the motion to

3  dismiss?  We don't need to meet again, I don't think.  I think

4  I understand where we are at.

5           MR. SLOTNICK:  Yes, Your Honor.

6           THE COURT:  Okay.

7           MR. GOLDENBERG:  My only -- that's completely fine

8  for Plaintiff.

9           Although, the only comment I'd make is that based on

10 previous dealings with Defendant's counsel or Defendant -- and

11 I say this with utmost respect.  When the complaint was filed

12 we were issued very, very strict, tight deadlines, which we've

13 obviously accommodated and responded to promptly, because we

14 had no choice because we were threatened with severe

15 consequences.  And despite our good-faith effort, numerous

16 good-faith efforts, we kind of -- we met those deadlines and

17 then we didn't hear from Defendant's counsel.

18          And so, when -- while I think we're more than

19 capable of coming up with a briefing schedule, if it comes to

20 that, we would like to put on record that we hope Defendant's

21 counsel does not exercise such severe deadlines if we were to

22 decide to make a motion to -- if we were to amend our

23 complaint, not give us 48 hours to do that once we get to that

24 point; that he would give reasonable time, obviously.

25          That's all.

Proceedings                                    24

1        MR. SLOTNICK:  I'm not sure why Counsel mentioned

2   that because that is, like the complaint, very vague.

3        What we did was, when we saw this complaint, we

4   said:  You're in violation of an NDA.  Because in this

5   complaint they disclosed facts and circumstances that are

6   covered by an NDA that Plaintiff signed.  And when Counsel

7   asked me to send it to him, even though his client had it, I

8   immediately sent it to him.  And I said:  We would like you to

9   seal or make an application to seal immediately.

10       So, I do take that last statement as a little bit of

11  a left turn, trying to cast an aspersion to me.  Because this

12  will be the basis of our counterclaim, which we did threaten

13  and they didn't seal it.  And there will be a counterclaim if

14  this proceeds because we believe that they are squarely in

15  violation of the NDA and it's not taken lightly.  This is

16  information that is subject -- in that case, actually, subject

17  to a written agreement.  And so yes, we did take it very

18  seriously.

19       I don't appreciate the aspersions by Counsel,

20  however.

21       THE COURT:  Okay, Counsel.  Let's put all the

22  aspersions aside.  I trust everyone will act reasonably going

23  forward and on dates.  And obviously, if you can't reach

24  agreement on the schedule, you will contact me and I will set

25  the schedule.  Usually counsel prefers to set their own

25

1  schedules by agreement rather than having me do it

2  arbitrarily.  So, it's up to you.

3          Okay.  But I think we're in a good position right

4  now.  You will contact Judge Scanlon.  If Judge Scanlon thinks

5  it's wise, she can also order mediation with our court-annexed

6  mediation which is very successful.  Sometimes it takes two

7  types of mediations to succeed.  And so, I will leave that up

8  to her.

9          Or if you decide you want a mediation order, you can

10  always get in touch with Victor and he'll issue that too.

11          MR. SLOTNICK:  Thank you.

12          THE COURT:  Okay.  So, is there anything else we can

13  take care of today?

14          MR. GOLDENBERG:  No.  Thank you, Your Honor.

15          THE COURT:  All right.  Thank you.

16          MR. SLOTNICK:  Other than the clock, I think we're

17  done.

18          Thank you, Your Honor.

19          THE COURT:  Thank you so much.

20          MR. McBRIDE:  Thank you, Your Honor.  Have a happy

21  Thanksgiving.

22          THE COURT:  Thank you.

23          MR. GOLDENBERG:  Happy holidays.

24          (Matter concluded.)

25